# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

**United States of America,**

*Plaintiff-Appellee,*

**Case No. 3:16-cr-097**

**v.**                                    **Judge Thomas M. Rose**

**Magistrate Judge Sharon L. Ovington**

**Kortnee Widup and Jessica Hickman,**

*Defendants-Appellants.*

---

### OPINION AND ORDER DENYING DEFENDANTS' APPEALS (ECF 73, 76)

---

This matter is before the Court on an appeal by Defendant-Appellant Kortnee Widup of a conviction rendered after a jury trial before Magistrate Judge Sharon L. Ovington (ECF 73) and another appeal by Co-Defendant-Appellant Jessica Hickman. (ECF 76). An information accused both Widup and Hickman of one count of conspiracy, in violation of 18 U.S.C.§ 371. (ECF 1). Widup was additionally charged with theft prior to September 11, 2013 for taking United States Air Force night vision goggles and Widup and Hickman were individually charged with theft for pawning them on September 18, 2015, all three charges constituting embezzlement and theft in violation of 18 U.S.C. § 641. On March 13, 2017, a jury convicted on all charges. This appeal ensued.

**Background**

In October 2015, Defendant-Appellant Widup had worked at Wright-Patterson Air Force

1

Base 5 to 7 days a week with Master Sergeant Ed Engel for 7 to 8 years. Engel was a trainer on the equipment Widup used. That relationship, the import and responsibility of their jobs, the small size of their unit, and the fact that they were both noncommissioned officers eroded the ordinary rank difference between the two. Engel liked Widup and considered her a friend.

Widup asked Engel if she could borrow a pair of United States Air Force night vision goggles for her and Defendant-Appellant Hickman, with whom she cohabitated. Based on their friendship, Engel consented.

Some time prior to September 11, 2013, Widup took the night vision goggles from the Air Force base back to the Huber Heights home she shared with Hickman. Widup did not return the goggles to the Air Force base. On September 18, 2015, Hickman decided to pawn the night vision goggles at Gem City Pawn in Englewood. When the owner of Gem City Loan and Pawn reported the night vision goggles to the Air Force, members of 88th Security Force Squadron at the Air Force base responded. The goggles were retrieved from the Gem City Pawn Shop by members of 88th Security Forces Investigations on October 5, 2015. (ECF 88, PageID 1128).

When Widup was interviewed by members of Security Forces on November 7, 2015, she admitted knowledge of the pawn, "Jessica and I had 30 days to pay back what we borrowed for the goggles." (Attach. 1 to Response and GE 3 at trial)  While Hickman claimed at trial that Widup told her not to pawn the night vision goggles, Widup's written statement, as well as testimony from both Hickman and the owner of Gem City Pawn established Widup never attempted to contact the pawn shop once the night vision goggles were pawned.

Staff Sergeant Brophy testified Widup admitted in an interview that she "knew that Jessica pawned the goggles" (ECF 78, PageID 462, Tr. Vol. II, 100, line 9). No cross-examination from either appellant attempted to contradict or refute SSgt Brophy's statement that Widup admitted she

2

knew the night vision goggles were pawned.

Engel testified that the night vision goggles found at the pawn shop are easily differentiated from those commercially available. The investigators recovered the Air Force night vision goggles from the pawn shop using government funds.

In a written statement from that interview Widup admitted, "Jessica and myself were struggling financially and needed cash for food and hygiene products so Jessica pawned the goggles until my next pay check was available." Govt. Ex. 3 at 3. Widup also stated her understanding of the parameters of the use of the night vision goggles, stating she was loaned the night vision goggles to "use on starry nights, to use to look at open fields away from city lights & was suggested to look at night as aircrafts take off." (ibid)

The jury convicted. Widup and Hickman appealed.

**Jurisdiction**

This Court has jurisdiction pursuant to 18 U.S.C. § 3402, which provides: "In all cases of conviction by a United States magistrate judge an appeal of right shall lie from the judgment of the magistrate judge to a judge of the district court of the district in which the offense was committed." However, "[t]he defendant is not entitled to a trial *de novo* by a district judge." Fed. R. Crim. P. 58(g)(2)(D). Instead, "[t]he scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered by a district judge." Id.

**Standard of Review**

On appeal, Defendant argues that the magistrate judge erred in denying Appellants' Rule 29 Joint Motion for Acquittal and that the Jury's guilty verdicts were supported by the evidence (See ECF 87, PageID 1098).

Where a defendant challenges a conviction on the basis of insufficiency of the evidence,

"the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

**Analysis**

I.      Sufficiency of the Evidence to Sustain a Conviction for Conspiracy

The Court instructed the jury that the United States only need prove one of the overt acts set forth in the Information to support a conviction of conspiracy. Trial Volume III, pages 335-336. Widup removed the night vision goggles from the Air Force base to the couple's home.   Widup's confession and Hickman's trial testimony admit that the night vision goggles were taken from Wright-Patterson Air Force Base to Huber Heights.   The same evidence showed Hickman later transported the night vision goggles to at least one other location within the Southern District of Ohio when she took the night vision goggles to the Englewood pawn shop.   So, the Appellants' testimony and written statement admitted to an overt act.   Those admissions were corroborated by other witnesses' testimony, as well as documentary evidence.

In addition to the overt act of transporting the night vision goggles off the Air Force base, a rational finder of fact could have also determined the night vision goggles, when traded for money, were   "offered for sale" (Overt Act allegation 4). See *United States v. Pazour*, 609 F.3d 950, 954 (8th Cir. 2010) ("It is clear the firearms became stolen when Pazour pawned them."). Additionally, the pawn shop owner testified his shop's expectation is that people who pawn things are the owners of those things.   That expectation stems from the fact that if the "pawner" fails to pay off the pawn loan "[t]hen they forfeit the merchandise, and then that becomes property of ours, and we can sell that property." (Tr. Vol I, p 27, lines 9-10).   Moreover, the couple "didn't have the money" (Tr. Vol. III, p 271, line 20- 22) for the majority of the pawn period to get the government

4

property back, and a rational fact finder could easily have determined that overt act was proven, as well.

Credible and persuasive evidence was also presented that a rational fact finder could have determined supported the alleged overt act of pawning. The night vision goggles were stolen when they were pawned. The pawn shop owner testified that once pawned, only Hickman or law enforcement would have been able to retrieve the pawned night vision goggles. The Air Force was deprived of the night vision goggles while they were locked in the pawn shop. The intent to deprive doesn't have to be permanent.

The agreement required for conspiracy need not be a formal agreement; rather, a tacit agreement or mutual understanding is sufficient. *United States v. Maliszewski*, 161 F.3d 992, 1006 (6th Cir. 1998), quoting *United States v. Lloyd*, 10 F.3d 1197, 1210 (6th Cir. 1993). See also *United States v. Ledezma*, 26 F.3d 636, 640 (6th Cir. 1994), citing *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990) (a tacit or material understanding is sufficient); *United States v. Frost*, 914 F.2d 756, 762 (6th Cir. 1990). Nor must the government prove that there was agreement on all the details of how the crime would be carried out. See, e.g., *United States v. Schultz*, 855 F.2d 1217, 1221 (6th Cir. 1988).

The government does not have to present direct evidence of an agreement. See, e.g., *United States v. Thompson*, 533 F.2d 1006, 1009 (6th Cir. 1976). An agreement "may be inferred from circumstantial evidence that can reasonably be interpreted as participation in a common plan," *United States v. Ellzey*, 874 F.2d 324 at 328 (6th Cir. 1989) or "from acts done with a common purpose." *United States v. Frost*, 914 F.2d 756, 762 (6th Cir. 1990). See Sixth Circuit Pattern Jury Instructions (Criminal), § 3.02 (commentary) (2017).

Widup's agreement to participate in the conspiracy was shown by her admission of

knowledge of the pawn during her November 7, 2015 interview. That admission was made close in time to the offense and before counsel could stress that the absence of an agreement would be fatal to the conspiracy charge. Widup's written statement confesses to use of the money from the pawn and being aware of the pawn. The requirement to show a knowing and voluntary agreement to be part of a conspiracy does not require showing a "major role in the conspiracy,…or that [the] connection to it was substantial." (ibid) There just needs to be a "mutual understanding, either spoken or unspoken, … to cooperate" in the conspiracy (Tr. Vol. III, p 333-334). There is no requirement that the agreement occur for the entire time the property was in the appellants' home. The United States' responsibility was met.

II.     Theft Count as to Defendant Widup

There was ample evidence for the 12 fact finders to determine the property was either stolen or wrongfully converted. During his testimony, Engel testified he loaned night vision goggles to Widup for her personal use. The two 445th witnesses, Engel and SMSgt Bowles, made it clear that while personal use of night vision goggles is not uncommon, it is also not unlimited. The pawn shop owner, Malott, testified his business doesn't permit individuals who don't own items to pawn them. In describing the pawn transaction, his testimony illustrated that Hickman relinquished custody of the night vision goggles to the pawn shop. If Hickman failed to return and provide money, the night vision goggles belonged to his company. Jurors hearing this testimony and the other evidence presented could have determined beyond a reasonable doubt that by agreeing to the pawn, an action depriving the United States of its ownership interest, both appellants were guilty of stealing the night vision goggles; Hickman because she traded the night vision goggles for money and Widup because she was a co-conspirator bound by the foreseeable actions of her co-conspirator. To pawn the night vision goggles required an intent to deprive the

United States of the use and benefit of the night vision goggles, at least temporarily. The jury heard the night vision goggles were locked in a pawn shop and the appellants couldn't afford to get them out until Widup got her paycheck.

The jury was instructed that even an "appreciable change of the location of the property with the intent to deprive" (Tr. Vol. III, pp 339-340) could be relied on to prove the theft. Transportation from the appellants' home in Huber Heights to the Englewood pawn shop would suffice. In light of the evidence elicited at trial, a reasonable juror could have determined beyond a reasonable doubt that the act of pawning the night vision goggles supported a conviction for stealing them. A rational juror might also be persuaded beyond a reasonable doubt that the pawn "knowingly converted" the night vision goggles from an authorized loan into an unauthorized one. Hickman's counsel stated in closing, "But for this pawnshop incident, no one would be the wiser that these night vision goggles were unaccounted for, missing, certainly not stolen." (Tr. Vol III, p 316, line 6). That act of pawning, committed by even one defendant, moved the personal loan from authorized to unauthorized. Regardless of whether the Air Force asked Widup to return the night vision goggles and regardless of how long the two had held onto them, Widup's written statement was that the pawn exceeded the scope of the authorized use.

Possession does not have to be wrongful from start to finish. The use of a loaned item may start as an authorized use and then take a turn into unauthorized territory.

III.    Evidence to Sustain a Conviction as to Widup and Hickman for Pawning

As regards counts three and four, which allege theft and embezzlement based upon the act of pawning, Appellants contest whether the individual jurors determined the night vision goggles were "sold" or "disposed of." Testimony, written evidence, and common sense supported both "sale" and "disposal." Malott and the contract from his company, which the jury could examine,

as well as testimony from the law enforcement witnesses and common sense, showed the pawn involved relinquishing the night vision goggles for money. According to Widup's written and oral confessions on November 7, 2015 and Hickman's testimony at trial, the money was then used for personal items by Appellants. Trading a thing for money and then spending the money and leaving the thing for weeks where the owner can't get it could be determined to be a "sale" by rational jurors. If the appellants didn't return for the night vision goggles, the pawn shop owned them. The testimony from Hickman herself, as well as her counsel at closing, was that the two didn't have the ability to buy the night vision goggles back for a large part of the pawn period. If a conspiracy was shown, an act by one of the two bound the actions of the other. Thus, Widup could be found guilty of the sale or conversion, even if she wasn't at the pawn shop. Appellants could also be found guilty if they wrongfully "disposed" of the night vision goggles. With the Defense's assent, the jury was instructed "disposal is defined as an act of transfer of an item to another." (Tr. Vol. III, p 341, lines 14-15). Such a transfer happened. Once there was a conspiracy, both appellants became responsible for whatever either one did to further that conspiracy, including pawning the night vision goggles. The jury heard and saw evidence that Widup understood the pawn meant "Jessica and I had 30 days to pay back what we borrowed for the goggles." (ECF 88-1, PageID 1143, Attach. 1, Govt. Ex. 3). Whether or not she went on the day the night vision goggles were pawned, Widup was bound by Hickman's acts.

Appellants have sought to shift blame to Engel. Engel's credibility was considered by the jury. Engel violated an administrative requirement to sign out equipment. At the same time, admitting he loaned night vision goggles without a hand receipt would "exonerate" Widup is a mystery. Pawning a piece of property that isn't yours, regardless of whether or not sign out protocols were followed is a crime. It's unlikely that the lack of a hand receipt would convince

any jury to hold Engel so accountable that the overwhelming evidence against the Appellants would be ignored. The evidence, particularly when viewed in the light most favorable to the United States, supports the jury's verdict of guilt beyond a reasonable doubt for both Appellants on all charges in the Information.

Therefore, the Appeals (ECF 73, 76) are **DENIED**.

**DONE** and **ORDERED** this Friday, February 2, 2018.

s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE